# EXHIBIT 6

Case 1:25-cv-00056-LPS   Document 57-7   Filed 07/08/25   Page 2 of 31 PageID #:
1780
Case 1:10-cv-01065-LPS   Document 145   Filed 08/01/12   Page 1 of 30 PageID #: 3068
                                                                              1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

 4    INTELLECTUAL VENTURES I LLC, and
      INTELLECTUAL VENTURES II LLC,        :    CIVIL ACTION
 5                                         :
                   Plaintiffs,             :
 6                                         :
                   v.                      :
 7                                         :
      ALTERA CORPORATION, MICROSEMI        :
 8    CORPORATION, LATTICE SEMICONDUCTOR   :
      CORPORATION and XILINX, INC.,        :
 9                                         :    NO. 10-1065 (LPS)
                   Defendants.
10                              - - -

11                              Wilmington, Delaware
                                Tuesday, July 10, 2012
12                              Telephone Conference

13                              - - -

14    BEFORE:          HONORABLE LEONARD P. STARK, U.S.D.C.J.

15                              - - -
       APPEARANCES:
16

17              FARNAN, LLP
                BY:  MICHAEL J. FARNAN, ESQ.
18
                     and
19
                DESMARAIS, LLP
20              BY:  MICHAEL P. STADNICK, ESQ., and
                     AMEET A. MODI, ESQ.
21                   (New York, New York)

22                     Counsel for Plaintiff

23

24                              Brian P. Gaffigan
25                              Registered Merit Reporter
```

Case 1:25-cv-00056-LPS   Document 57-7   Filed 07/08/25   Page 3 of 31 PageID #:
1781
Case 1:20-cv-01055-LPS   Document 145   Filed 08/01/12   Page 2 of 30 PageID #: 3069
2

```
 1    APPEARANCES:  (Continued)

 2
                   RICHARDS LAYTON & FINGER, P.A.
 3                 BY:  ANNE SHEA GAZA, ESQ.

 4                      and

 5                 O'MELVENY & MYERS, LLP
                   BY:  BRIAN BERLINER, esq.
 6                      (Los Angeles, California)

 7                      Counsel for Microsemi Corporation

 8
                   ASHBY & GEDDES, P.A.
 9                 BY:  TIFFANY GEYER LYDON, ESQ.

10                      and

11                 COVINGTON & BURLING
                   BY:  MICHAEL N. KENNEDY, ESQ.
12                      (Washington, District of Columbia)

13                      Counsel for Lattice Semiconductor Corp.

14
                   MORRIS NICHOLS ARSHT & TUNNELL, LLP
15                 BY:  KAREN JACOBS LOUDEN, ESQ.

16                      and

17                 WOMBLE CARLYLE SANDRIDGE & RICE, LLP
                   BY:  BEHROOZ SHARIATI, ESQ.
18                      (Palo Alto, California)

19                      Counsel for Xilinx Inc.

20
                   MORRIS NICHOLS ARSHT & TUNNELL, LLP
21                 BY:  JACK B. BLUMENFELD, ESQ.

22                      and

23                 WILMER CUTLER PICKERING HALE
                   BY:  MARK D. SELWYN, ESQ., and
24                      EVELYN C. MAK, ESQ.
                        (Palo Alto, California)
25
                        Counsel for Altera Corporation
```

Case 1:25-cv-00056-GFS   Document 57   Filed 07/08/25   Page 4 of 31 PageID #:
Case 1:20-cv-01055-LPS   Document 145   Filed 08/01/12   Page 3 of 30 PageID #: 3070
1782
3

1                        - oOo -

2                  P R O C E E D I N G S

3                (REPORTER'S NOTE:  The following telephone

4     conference was held in chambers, beginning at 2:27 p.m.)

5                THE COURT:  Good afternoon, counsel.  This is

6     Judge Stark.  Who is there, please?

7                MR. FARNAN:  Good afternoon, Your Honor.

8     Michael Farnan on behalf of Intellectual Ventures.  With us

9     on the call is Michael Stadnick and Ameet Modi of Desmarais,

10    LLP.

11               THE COURT:  Okay.

12               MR. STADNICK:  Good afternoon, Your Honor.

13               MR. BLUMENFELD:  Good afternoon, Your Honor.

14    It's Jack Blumenfeld for Altera; along with Mark Selwyn and

15    Toby Mak from WilmerHale.

16               THE COURT:  Okay.

17               MR. SELWYN:  Good morning.

18               MS. JACOBS LOUDEN:  And for Xilinx, this is

19    Karen Jacobs Louden for Morris Nichols.  I have on the

20    line with me, Behrooz Shariati from Womble Carlyle.

21               THE COURT:  Okay.

22               MS. GAZA:  Good afternoon, Your Honor.  It's

23    Anne Gaza from Richards Layton for Microsemi; and I am

24    joined by Brian Berliner of O'Melveny & Myers.

25               THE COURT:  Okay.

 1          MS. LYDON:  Good afternoon, Your Honor.  Tiffany

 2   Lydon from Ashby & Geddes on behalf of defendant Lattice

 3   Semiconductor.  With me is Michael Kennedy from Covington &

 4   Burling.

 5          THE COURT:  Okay.  That is everybody; correct?

 6          All right.  Thank you.  I have a court reporter

 7   with me.  For the record, it is our case of Intellectual

 8   Ventures I and II, LLC v Altera Corp., 10-1065-LPS.  We are

 9   here to discuss three disputes regarding the proposed

10   protective order.  The defendants raised the dispute

11   initially, so we will hear from them first.

12          MR. SHARIATI:  Good afternoon.  This is Behrooz

13   Shariati.  With the Court's permission, I have been

14   deputized by the other defendants to present the argument.

15          THE COURT:  That's fine.  Thank you.

16          MR. SHARIATI:  Your Honor, just cutting to the

17   heart of the matter, the first dispute is over the special

18   procedures that we have proposed for and the limitations we

19   proposed on the inspection and copying of the material that

20   is essentially the equivalent of source code for the kind of

21   products at issue in this case.

22          What we have offered the defendants is to make

23   available a computer with the appropriate software and the

24   hardware in a secure facility, for them to come with their

25   expert and inspect, select a portion of the material they

Case 1:25-cv-00056-LPS   Document 57-7   Filed 07/08/25   Page 6 of 31 PageID #2
Case 1:25-cv-01065-LPS   Document 145   Filed 08/01/12   Page 5 of 30 PageID #: 3072
1784
5

1    need and to have that produced in the -- you know, have

2    that copied and production numbered and given to them in

3    the normal course.

4            The plaintiffs' chief complaint basically is, they

5    haven't really engaged with us on any specific provision of

6    this.  They basically said to us that this is unusual, this is

7    unnecessary, this is not done in cases such as this.  And they

8    are wrong about all of that.

9            First of all, the Federal Rules of Civil

10   Procedure contemplates and provides for producing documents

11   through inspection, so that is nothing new about that.

12           With respect to the cases, the protective orders

13   they have cited in their papers, basically every single one

14   of them is wrong.  For example, they have cited the *Lonestar*

15   protective order in their order, the *Lonestar* v *Xilinx* case.

16   And in support of their opposition, they cite to, this is

17   Exhibit A to plaintiffs' papers, they cite to, on page 9,

18   they site to Section 5.1 of the protective order that says

19   the electronic documents shall be produced on CD ROMs, et

20   cetera.

21           Well, if you keep reading on the same page,

22   Your Honor, the exactly following section, Section (b), 5.3.

23   I'm sorry.  5.3(a) was the one I cited.  Section 5.3(b)

24   says:  The producing party, at its own option, can produce

25   documents using the procedure remarkably similar to what we

1    have proposed here.

2              On that score, they are wrong.  In fact, Section

3    5.1 of that protective order defines, very broadly defines

4    the kind of materials that are subject to this procedure,

5    which include source code as well as HDL, DDF, you know, all

6    the kind of stuff that we have to produce in this case.

7              Moving on to the past protective order they

8    cited, again they cited to a supplemental order that adds an

9    additional layer of security to documents that are copied

10   and provided to the other party.  What they fail to do is

11   to cite to the original protective order which is easily

12   obtainable.  And in that protective order, Section 5.1(a)

13   talks about inspecting the material for production and,

14   again, not the same exact procedures we have outlined here,

15   but, again, it contemplates the fact that the documents

16   will not be just copied and sent to them but they have to

17   come and look through them and pick ones they want.

18             THE COURT:  All right.  Let me shift you to the

19   orders that you have cited.  The plaintiffs say that each of

20   them are more restrictive at least in terms of access than

21   what you propose here.  Address that.

22             MR. SHARIATI:  The restrictions come generally

23   in the form of the printing.  Most of the protective orders

24   of this kind, including the default rules for software, for

25   example, in the District of Delaware, do not provide for

1   onsite printing.  The inspection party has to designate what

2   they want, what they want to see, and that goes through a

3   process of being printed by the producing party and

4   production numbered and then delivered.

5            What we have proposed here, which is less

6   restrictive, is to have a printer actually attached to the

7   machine used for the inspection and having them make their

8   own prints.  We still have to attach production numbers but

9   this is a lot less restrictive than what we had.  The other

10  aspect of it in terms of notice and where the documents are

11  going to be produced, we're willing to work with them on

12  that.  But in that respect, what we have produced is

13  actually less restrictive, Your Honor.

14            THE COURT:  And the 20 pages consecutive and

15  500 pages total, is that per defendant?

16            MR. SHARIATI:  Yes, Your Honor.  That is per

17  defendant.  And, by the way, that is the proposal that we

18  made.  Obviously, if they need more, we would be willing to

19  negotiate and meet and confer on that.  They didn't really

20  engage with us on those particularly pinpoint issues.  They

21  basically said that they can't have this procedure at all.

22            THE COURT:  All right.  I think you actually

23  represent Xilinx but I know you are speaking on behalf of

24  all defendants.  Address the argument that some of these

25  materials at least on behalf of your client were produced

1    without these protections in other cases.

2              MR. SHARIATI:  Your Honor, they were not.  That

3    is simply incorrect.

4              THE COURT:  Can you represent that on behalf of

5    all the defendants?

6              MR. SHARIATI:  To the extent that I know, Your

7    Honor, and I can represent that for Xilinx.  And I actually

8    have -- and maybe counsel for the individual defendants can

9    speak up if I'm wrong, but, for example, the *Altera v LSI*

10   case, I've been informed that the materials that are at

11   issue in that case that were similar to this, they were

12   produced under the exact same regime as the source code was.

13             And then the other ones I believe also -- and,

14   again, this is, I think that counsel for the other parties

15   should speak up, but I understand that there was another

16   protective order that was cited and they also did not produce,

17   simply just turn over their material to the other party in

18   that case but basically was under a similar set of controls.

19             THE COURT:  Okay.

20             MR. KENNEDY:  Your Honor, this is Mike Kennedy

21   for defendant Lattice, just to follow-up.  I can represent

22   for Lattice.

23             As far as Lattice can tell, it has never produced

24   this sort of material except under a similar regime as what

25   defendants propose here.

Case 1:25-cv-00056-CFS    Document 55-7    Filed 07/08/25    Page 10 of 31 PageID #:
Case 1:10-cv-01055-LPS    Document 145-7    Filed 08/01/12    Page 9 of 30 PageID #: 3076
1788
9

 1              THE COURT:  All right.  Thank you.

 2              Altera, are you able to make the same

 3       representation?

 4              MR. SELWYN:  With respect to the *Altera v LSI*

 5       case, I can represent Altera made available its schematic

 6       and hardware code in a same manner that we're proposing

 7       here.  The case actually resolved itself before the other

 8       side did such an inspection but there was no dispute in the

 9       case that that is the way such an inspection would occur.

10              THE COURT:  Okay.  How about Microsemi?

11              MR. BERLINER:  Your Honor, this is my Brian

12       Berliner for Microsemi.

13              The letter from Mr. Farnan didn't identify any

14       instances in which they were aware of Microsemi producing

15       materials under less restrictive provisions; and I'm not

16       aware, having spoken with the client, of any such situations

17       or its predecessor in interest, which was Actel.

18              THE COURT:  Okay.  Thank you.

19              Mr. Shariati, let me have you move on to the

20       other two issues in dispute, please.

21              MR. SHARIATI:  Yes, Your Honor.  The next

22       question is the question of the acquisition bar.  I think

23       this is fairly straightforward.

24              The plaintiffs have agreed to a prosecution bar in

25       this case.  So this is essentially acknowledging that there is

1    a risk in the persons who see confidential information from

2    these defendants being engaged in prosecuting patents that

3    they could, through even with the best of intentions, they

4    could cause claims to be written to cover products based on

5    the information that they received in the case.

6            This is a sensible precaution.  It's routine in

7    patent cases.  The thing that complicates this a little bit

8    is that both, the IV entities and the Round Rock entity

9    that is Mr. Desmarais's other venture, both of these are

10   non-practicing entities whose vast majority of their patents

11   are not prosecuted from scratch but are simply acquired and

12   then asserted against working entities such as my client or

13   the other defendants in this case for licensing purposes.

14           So in this situation, because of the nature of the

15   enterprise and as set out in our papers, the prosecution bar

16   would not be sufficient to protect the potential leakage, the

17   inadvertent leakage of highly confidential information to the

18   patenting side of the house, to the patent acquisition side

19   of the house.  So we feel, since the patent prosecution bar

20   is appropriate, then the patent acquisition bar, because of

21   the nature of the business involved here, would also be

22   appropriate.

23           THE COURT:  Does your proposal seek to bar, say,

24   Mr. Desmarais, for example, from acquiring any patent and

25   from advising any client or anyone on any patent acquisition?

1      MR. SHARIATI:  No.  First of all, this is not

2   directed at Mr. Desmarais necessarily.  This is anyone who

3   is exposed to a highly confidential information would be

4   subject to the bar, the prosecution bar -- I'm sorry --

5   acquisition bar similar in scope to the prosecution bar in

6   the case.  You know, it is not going to stop the man from

7   working or acquiring patents.  It is within the same scope

8   as the prosecution bar they have already agreed to.

9      THE COURT:  All right.  Thank you.  Do you want

10  to address briefly the competitive decision maker bar?

11     MR. SHARIATI:  Yes, Your Honor.  That is even

12  more straightforward.  We feel that under cases such as *U.S.*

13  *Steel* that we have cited, the defendants are entitled to

14  prevent anyone who is a competitive decision maker from

15  viewing confidential information from the defendants for the

16  reasons that are stated in that case and other cases such as

17  that so that there is no accidental or inadvertent leakage

18  of information within that person's mind when they're making

19  competitive decisions.

20     This is not a John Desmarais provision.  This

21  is anyone who is a competitive decision maker who could

22  potentially make decisions that would put the defendants in

23  this case in an adverse or in a disadvantageous position

24  solely because of their knowledge of the highly confidential

25  documents should be barred from engaging in that activity.

1    So they can have a choice.  They can either

2    be on this case and see the highly confidential product

3    roadmaps, the financial information and all that stuff, or

4    they could be an entrepreneur and run a business.  We just

5    feel that under *U.S. Steel*, the two shall not meet in the

6    same person.

7    THE COURT:  And why is the bar on use of the

8    information for any purpose other than this litigation not

9    adequate protection?

10   MR. SHARIATI:  Because, Your Honor, the bar

11   frankly comes into play after they know the information.

12   And outside science fiction, it is really not possible to

13   erase that information from a person's mind once they have

14   been exposed to it.  So as honorable and as trustworthy as

15   Mr. Desmarais or anyone else on that firm is, and we cast

16   no aspersions on anybody, it is not possible for them to

17   isolate the information they learn in this case after the

18   fact while they are going and making business decisions.  So

19   we think it is more from a point of view of security.  And

20   from a point of view of avoiding disputes later, it makes

21   sense just so they're not exposed to it in the first place.

22   THE COURT:  And what about the representation

23   in the letter that at least Mr. Desmarais said he will not

24   participate in any future Round Rock activities adverse to

25   any of the defendants?  Does that not provide you the

1    protections you are seeking?

2            MR. SHARIATI:  Not completely, Your Honor.  For

3    one thing, as long as he -- one perfect example, one easy

4    example I can give you is if the Round Rock entity is

5    adverse to a customer of one of these defendants, not to

6    the entity as a whole, not to the current entity, and that

7    will necessarily involve the defendants here even though the

8    adversity may be with some other entity.  So we think that is

9    not adequate protection.  The best way to avoid the problem is

10   to just not have the exposure to the confidential information

11   in the first place.

12           THE COURT:  Okay.  Thank you.  Let me hear now

13   from IV, please.

14           MR. STADNICK:  Yes, Your Honor.  It's Michael

15   Stadnick for the IV plaintiffs.  Good afternoon.

16           THE COURT:  Good afternoon.

17           MR. STADNICK:  I'll start with the source code

18   category.

19           The problem we have the proposed source code

20   category is that it seeks to create what are really

21   unmanageable obstacles to our intent to take discovery of

22   core technical documents in the case, and they're really not

23   justified by any actual confidentiality or security concern.

24           So I'd like to start by stepping back a bit

25   and drilling down on exactly what restriction that they're

Case 1:25-cv-00056-CFC Document 57 Filed 07/28/25 Page 15 of 31 PageID #: 1793
Case 1:19-cv-01065-LPS Document 145 Filed 08/01/19 Page 14 of 30 PageID #: 3081

14

1    attempting to place on production and review of these

2    documents.  They created a category of what they call for

3    the purposes of the protective order source code documents,

4    and counsel described then as being the analog to source

5    code for purposes of the products in this case.  But that

6    is not really accurate.

7         The documents we're looking to obtain here

8    through discovery really aren't source code, and they don't

9    present the same sort of security and confidentiality issues

10   that you get with source code.  I'm happy to get into that,

11   and I'll return to that in a bit, but I think it's important

12   to look at what these documents actually are.

13        What they are are the electronic documents which

14   represent the blueprints for the accused products in this case.

15   They describe the architecture of the product, the circuitry

16   of the products, and the functionality of the products.  They

17   are at bottom the core technical documents that the defendants

18   are supposed to, under Your Honor's scheduling order, produce

19   to us by July 25th in this case.  That is only two weeks away.

20   We haven't received any technical documents yet at all or any

21   other documents for that matter in the case.

22        So to characterize these as source code

23   documents is really, from our vantage point, just an effort

24   to kind of analogize them to the type of protections that we

25   often see in cases for source code and don't dispute can be

1    appropriate in a source code context.

2           So what are those protections and what hurdles

3    are they trying to put up to our review of the documents in

4    this case?

5           Well, first, as counsel mentioned, they're

6    seeking to make us travel to outside counsel's office each

7    and every time we want to review a core technical document

8    in this case.  So if we want to review Xilinx's core

9    technical documents, we have to get on a plane and fly to

10   California and sit in a room in Xilinx's counsel's office

11   and review the documents there.  Likewise, with Altera,

12   we have to go to a separate counsel's office and review

13   documents.  With Lattice, we have to go to their counsel's

14   office, and so on.  And that is just unpractical and

15   unnecessary.

16          In addition to that, as Your Honor mentioned,

17   they're seeking to put some very severe restrictions on our

18   ability to print out and later review the documents that

19   are on the secure computer.  At any given time, we can

20   only print out 20 consecutive pages.  So if we have a core

21   technical document like a product specification that runs

22   over 20 pages, we're out of luck unless, of course, we

23   move the Court and bear the burden of demonstrating that

24   we're entitled to have every page of a document that is

25   more than 20 pages rather than some excerpt.

 1              Likewise, as Your Honor mentioned, they're

 2    seeking to impose a 500 page limit on the production of core

 3    technical documents by any one defendant in this case.  I

 4    can't recall ever being in a patent infringement case, and I

 5    suspect most of the folks on the line would agree, where a

 6    defendant produced only 500 pages of technical documents for

 7    the accused products.  So that doesn't seem reasonable.

 8              And then on top of all that, their proposed

 9    provision effectively imposes a veto power on them to take a

10    look at whatever it is we decide to print, decide whether

11    they think it is being printed for an appropriate purpose

12    or not.  And if they, for whatever reason, decide it's not,

13    again the burden shifts on us to bring a motion and demonstrate

14    that we are printing the information for an appropriate purpose.

15    And that will just invite further motion practice and create

16    a lot of unmanageability in the discovery process going

17    forward.

18              So I guess the question becomes what grounds do

19    the defendants have for seeking these severe limitations?

20    And the answer is none, really.

21              We saw in the briefing and heard a little bit

22    today that these are their clients' crown jewels and the

23    most important documents in the company and that undisclosed

24    catastrophic events could happen if they're inadvertently

25    disclosed somehow.  But as defendants made clear to us, and

1  I know we have heard a little something different here

2  today, it's our understanding that defendants have in fact

3  made these exact same documents available for production in

4  prior litigations without these kinds of productions.

5        We've been meeting and conferring on this

6  issue for over a month now.  We have consistently asked them

7  to confirm for us whether or not they have produced the

8  documents without these protections.  They refuse to deny

9  the fact that they produced them in other litigations.  We

10  pulled protective orders from other litigations that don't

11  appear to impose those restrictions.

12        I understand that counsel today has taken issue

13  with our understanding of those protective orders.  That is

14  the first we've heard of any of it.  So to the extent that

15  they haven't produced documents without the same protections,

16  this is the first time we heard of it.

17        I listened pretty carefully for counsel for Altera

18  and counsel for Microsemi.  Counsel for Altera indicated in

19  the *LSI* case, he understood that these protections were in

20  place but he didn't make a broad representation as to other

21  cases.  And counsel for Microsemi likewise said he wasn't

22  aware of any other cases where they produced it, but it's

23  unclear to me even today they're making the representation

24  you asked them to make in the meet and confer process.

25        As Your Honor pointed out in the context I

1    believe of the prosecution bar, the general provision in the

2    protective order preventing us as outside counsel from using

3    materials produced in discovery for any purpose other than

4    this litigation should provide an ability for them to be

5    confident that we don't have any intention of abusing this

6    information.

7              I will return to, because I think it's important,

8    the technical documents that are at issue in this case and

9    source code.  Source code is a person's readable instructions

10   for software.  And software obviously presents a lot of

11   problems because source code gets disclosed inadvertently.

12   It's easy to copy, it's easy to disseminate, and it's easy

13   for anybody to take portions of it and use it for ... (Audio

14   lost.)

15             THE COURT:  I'm sorry.  We lost you for a

16   second.  Repeat that last sentence.  It's easy for what?

17             MR. STADNICK:  It's easy for pretty much anybody

18   who gets their hands on source code to takes portions of it

19   or all of it and compile it and work it into their own

20   program and distribute it, to sell it, and it's very

21   difficult to detect.  That is just the nature of software.

22             In this case, we're talking about a FPGA chip.

23   To make a FPGA chip, you need a fabrication facility which

24   costs a billion dollars.  This isn't the same sort of

25   situation where even inadvertent disclosure of this

 1    information creates a risk that somebody is going to copy

 2    their chip and start competing with them in the marketplace

 3    by selling FPGA chips.  So it's fundamentally different in

 4    that regard doesn't present the same sort of concerns.  And

 5    I think that is why customarily we haven't seen this kind

 6    of information, whether in an FPGA case or DRAM case or

 7    any other semiconductor case, be afforded this level of

 8    protection.

 9            Not to belabor the point but to briefly touch

10    on the support that the defendants cite for their proposed

11    restrictions on production of core technical documents.

12    The one case that any of the parties have identified from

13    Delaware that addresses this issue is the *ProMOS v Freescale*

14    case that was decided by Judge Farnan a few years back.

15    It's pretty much squarely on point.

16            The defendant Freescale sought confidentiality

17    protections that require inspection of RTL and HDL and

18    specification documents on a secure computer subject to very

19    stringent printing restrictions, and the defendant in that

20    case made all the same arguments we hear here today about the

21    crown jewels and about the hardware code being analogous to

22    source code.  Judge Farnan ordered that these documents be

23    produced on a CD or DVD just like any other document.  And

24    there is no indication that there were any dire consequences

25    in that case, anything got inadvertently disclosed, that any

1    prejudice was suffered by the defendant at all.  And there is

2    no reason to believe that that would be suffered here.

3         We identified the *ProMOS v Freescale* case to the

4    defendants during the meet and confer process.  They didn't

5    address it in their briefing.  They didn't address it in

6    their comments here today.  Instead, they focus on either

7    stipulated protective orders from other districts or the

8    optional provisions of the Northern District of California,

9    model protective order.  Obviously, parties can address to

10   whatever restrictions for whatever reason they decide to

11   agree to.  It doesn't provide support for imposing those

12   restrictions involuntarily on us here today.

13        So, at bottom, the only thing that entering the

14   so-called source code provisions of the protective order is

15   going to accomplish is to make it extremely difficult, if

16   not impossible, for us to conduct meaningful discovery of

17   the defendants' core technical documents, certainly within

18   the time frame the Court set out the scheduling order; and,

19   for that reason, we believe that the source code provision

20   should be rejected.

21        THE COURT:  Did you want to say anything about

22   the acquisition bar?

23        MR. STADNICK:  About the acquisition bar, we

24   really only have two relatively minor issues with it:

25        One, again, is it's unnecessary in light of the

1   provision that prevents us from using confidential

2   information for purposes other than this case.

3        The second issue is a slightly more practical

4   one.  That is, we're seeing these sorts of arguments more

5   and more frequently in litigation these days, and when we

6   agree to a provision like an acquisition bar simply because

7   it doesn't matter to us, we don't plan to acquire patents

8   in this area, the next time an argument comes down the road,

9   just as we have seen in the letter briefing here, another

10  litigant will point to it as an indication that we made some

11  sort of concession or acknowledgment that there really was

12  an actual risk of inadvertent disclosure.

13       Now, that is a minor concern and that is not some-

14  thing we would stand on in fighting this provision.  Frankly,

15  I think we would be willing to agree to the provision if

16  counsel for the defendants would agree that it resolves the

17  so-called competitive decision maker issue, which I will turn

18  to next.  But as long as we're going to be, and I think we

19  will be if I am reading the tea leaves right, arguing that

20  issue more fulsomely, we might as well drill down and

21  determine whether there is a factual basis that justifies

22  entering into an acquisition bar in the case.

23       THE COURT:  All right.  Then why don't you very

24  briefly, because I'm running out of time, talk about the

25  competitive decision maker bar.

1          MR. STADNICK:  Okay.  The interesting thing

2     about the competitive decision maker bar is if you look at

3     it, it doesn't actually have any impact on discovery in

4     this case.  It doesn't, on its face, prevent or allow the

5     defendants to withhold production of documents.  It merely

6     allows them to designate with a special designation.  And it

7     doesn't prevent us from reviewing it the way we normally

8     would review it because as we made clear, our view was that

9     nobody at my law firm is a competitive decision maker.

10          So why are they asking for this provision?  And

11    there is really only one reason.  That is because they foresee

12    filing in the motion a motion to specifically preclude me or

13    Mr. Desmarais or some other attorney at my firm from accessing

14    their confidential information, and they're trying to set up

15    an artificially low, legally erroneous standard to litigate

16    that motion.

17          The *U.S. Steel* case, the *Deutsche Bank* case, if

18    you look at the relevant authority in that case, it's clear

19    if they want to preclude outside counsel, litigation counsel,

20    from accessing their confidential information, they've got to

21    show a couple things:

22          First.  They have to show on a case-by-case, fact

23    specific, person-by-person basis that there is an actual

24    unreasonable risk of inadvertent or improper disclosure if

25    that particular person receives confidential information.

1          Second.  Assuming they can show that, there is a

2     balancing test that has to be performed where you weigh that

3     risk against the hardship to the counsel of the party whose

4     counsel is going to be impacted to determine whether a

5     protective order is appropriate.

6          What they're trying to do with this provision of

7     the protective order is to sidestep all of that and reduce

8     the analysis when, and if, they get around to filing the

9     motion that we expect them to file.  We don't think the

10    motion has merit but it seems that they're going to file it.

11    When they file it, they're going to say all we have to do

12    is look at the protective order provision, prove in the

13    abstract that this person fits whatever this definition of

14    competitive decision maker is, and then they're per se

15    barred from receiving that confidential information.  And

16    that is not the standard.  That is not the standard that

17    should apply when they file their motion, if they file

18    their motion.  And that is why we oppose entering it in a

19    protective order.

20          THE COURT:  All right.  Thank you.

21          Mr. Shariati, any brief response?

22          MR. SHARIATI:  Very, very briefly, Your Honor.

23          We couldn't possibly disagree more with

24    Mr. Stadnick on the level of confidentiality of this material.

25    But I think the confusion here is -- I think there is some

Case 1:25-cv-00056-GFC    Document 57    Filed 07/28/25    Page 25 of 31 PageID #1
Case 1:19-cv-01065-LPS    Document 145    Filed 08/01/19    Page 24 of 30 PageID #: 3091
1803
24

1   level of confusion here that the plaintiffs are conflating

2   the very specific documents we wish to protect under this

3   procedure, which is design documents and materials that

4   essentially describe the actual structure of the devices that

5   can in fact be used to reproduce these devices.  You don't

6   actually need to build your own foundry, Your Honor.  As you

7   know, there are third-party foundries that make this stuff for

8   you.  Xilinx doesn't have its own foundry.  Everything is made

9   by GFMC in Taiwan.

10          So Mr. Stadnick couldn't be any more wrong

11  about that aspect of it.  And we have made this clear to the

12  plaintiffs that we're not trying to sweep in text documents,

13  things in our specification, anything other than what is in

14  the design database that has to be accessed via that special

15  mechanism for the engineers to build and design these

16  devices.  Anything else that is in the regular databases for

17  whatever, we would process those and if they're responsive,

18  we would produce them in the normal course.

19          Regarding the competitive decision maker, in

20  fact, Your Honor, if you look at the provision, we didn't

21  try to change the law in any way there.  We just said if

22  someone is a competitive decision maker as under *U.S. Steel.*

23  In fact, we cited to that very case in the language proposed.

24  So we're not trying to change the barrier or anything else.

25  We just want to make sure that we have the right to prevent

1    our material falling into wrong hands -- potentially the

2    wrong hands.

3                    That's all I have to say on that, Your Honor.

4                    THE COURT:  And what about your anticipated

5    motion?  Is it correct you anticipate filing a motion?

6                    MR. SHARIATI:  Your Honor ... (Audio lost.)

7                    THE COURT:  I'm sorry, you are breaking up.  Can

8    you try that again?

9                    MR. SHARIATI:  Sure.  As I'm sitting here right

10   now, I can tell you without breaching client/attorney privilege

11   that no such motion is contemplated at this time, but I can't

12   give a blanket assurance it will not be forthcoming.

13                   But as Mr. Stadnick correctly points out, it

14   really all depends on the factual picture of what exactly

15   the individuals do vis-a-vis this case and vis-a-vis their

16   entrepreneurial venture.  So this is not.  We're not trying

17   to lower the bar or anything like that.  We're trying to

18   reserve the right to object if the facts support that.

19                   THE COURT:  Okay.  Fine.  Thank you.  Well, let

20   me give you my rulings on these disputed provisions.  They're

21   all provisions proposed by the defendants and the plaintiffs

22   resist them.  And let me go through them in order.

23                   First is the proposed Section 2.7 relating to

24   whether we will have in this protective order a highly

25   confidential source code designation that would apply to

1    what everyone seems to agree is not literally source code.

2            I'm going to include in the protective order a

3    provision that looks a lot like what has been proposed by

4    the defendants.  Some of the details are going to differ.

5    And I'm going to, and hereby do, direct the parties to meet

6    and confer in light of what I'm about to say and see if you

7    can agree on the details.  And if you can't, then obviously

8    I will resolve that going forward.

9            But let me first say, in general, the Court

10   believes that good cause has been shown for the type of

11   protection of this type of material as sought by defendants.

12   In the Court's view, these hardware design materials and

13   schematics and similar documents are analogous to software

14   in a software case and, therefore, are worthy of some type

15   of source code like protection.

16           The analogy holds up in the Court's view in part

17   because it's represented at least that these materials can be

18   used, by those who are knowledgeable and have access to the

19   right materials, they can be used to replicate the defendants'

20   products.  Improper disclosure of these materials therefore

21   would work the same type of harm to defendants as improper

22   disclosure of software.  And all of this is reflected in how

23   these materials are, it is represented, maintained by the

24   defendants.  For instance, in some sort of some complex

25   hierarchal electronic database.

Case 1:25-cv-00056-CFC   Document 45-7   Filed 07/28/25   Page 28 of 31 PageID #:
1806
Case 1:19-cv-01063-LPS   Document 145   Filed 08/01/19   Page 27 of 30 PageID #: 3094
27

1          While I understand the plaintiffs argues that

2     there are fewer people who can make use of this type of

3     material than evidently could use make of software, that

4     does not in the Court's view make the analogy inappropriate

5     and indeed I think reflects and does nothing to deny that

6     there is great value to these materials, and it is appropriate

7     for defendants to wish to be careful about how they are

8     distributed and to whom.

9          The issue then becomes what about the precise

10     protocols that the defendants are proposing to limit the

11     plaintiffs access to these materials?  And I do think the

12     precise protocols listed are too onerous in light of the

13     fact that there are multiple parties here, in light of how

14     few pages the defendants have initially offered to allow to

15     be printed.

16          So what I want the parties to meet and confer

17     on and discuss is how much to expand the printing that is

18     authorized in the protective order.  20 consecutive pages

19     and a total of 500 pages per defendant strikes me as too

20     small in both regards, so the parties should see if they can

21     reach agreement on a larger number.

22          I want the parties to discuss whether it is

23     possible to identify one outside counsel's office that could

24     take possession of these materials for all four defendants

25     and thereby locate them in one office that plaintiff's

1    counsel would be able to go to and more efficiently review

2    these materials.  And I would contemplate even ordering

3    that one office to be located in a city of the choice of

4    the plaintiffs, because I do want to make sure that these

5    provisions, while necessary to protect defendants' valuable

6    properly, do not make it unduly burdensome for plaintiffs to

7    investigate and prosecute its case.

8              So all that said, you all are to meet and confer

9    and submit to me a revised proposed protective order that

10   includes a provision like the defendants have proposed,

11   hopefully with agreed upon specifics in terms of the protocol

12   in light of what I have said.  If there remain disputes about

13   the protocol, then put your competing proposals in what you

14   submit.  And if I need anything further from you, I will let

15   you know.

16             I have also considered that plaintiff has

17   pointed me to a case from this district in which Judge

18   Farnan reviewed a similar request and evidently denied it.

19   On that, all I can say is that reasonable minds can disagree

20   on issues like this, and I'm persuaded to do as I have said

21   here I intend to do with respect to the protective order here.

22             Turning briefly to the other two disputed

23   provisions, the proposed bar on competitive decision making,

24   decision makers having access to the highly confidential

25   information and the proposed bar on participation in patent

1    acquisition.  The protective order I sign should contain all

2    those provisions.  I'm persuaded by defendants that they are

3    appropriate.

4              With respect to the competitive decision maker

5    proposal, I do want to emphasize I am not today making any

6    finding as to whether anybody affiliated with this case,

7    affiliated with the plaintiffs, affiliated with plaintiffs'

8    firms, whether he or she would be found to be a competitive

9    decision maker.  It's not necessary to resolve that issue

10   today.  And,

11             If that issue does arise, nothing I am ruling

12   today by adopting the defendants' proposal is intended to

13   alter or reduce in any way the showing that would be

14   necessary by defendants if they are to seek to prevent any

15   particular person in this case from having access to the

16   highly confidential information.  And as I understand it,

17   the defendants do not believe that their proposal, which

18   is now being adopted in any way alters the showing that

19   they would have to make if that day comes.

20             With respect to the patent acquisition bar,

21   essentially the plaintiffs' argument is it's unnecessary in

22   light of the agreed upon bar on use of information for any

23   purpose other than the litigation.

24             On that point, I'm more in agreement with the

25   defendants that that simply is not adequate protection in

Case 1:25-cv-00056-CFC   Document 57-7   Filed 07/28/25   Page 31 of 31 PageID #:
1809
Case 1:19-cv-01065-LPS   Document 145   Filed 08/01/19   Page 30 of 30 PageID #: 3097

30

```
 1    the context here given, as far as I understand, the

 2    essential impossibility of human beings to completely

 3    segregate their minds and not make any inadvertent use

 4    whatsoever of any information once they are exposed to it.

 5              I need to jump on to another call but, very

 6    quickly, I'll ask if there are any questions on what I have

 7    ruled.  First, Mr. Shariati.

 8              MR. SHARIATI:  No, your Honor.  Is there any

 9    particular time line you have in mind for us or can we just

10    meet and confer during the next few weeks?

11              THE COURT:  If I did not say, I meant to say a

12    week from today.  So I want your revised proposed protective

13    order a week from today.  Thank you.

14              MR. SHARIATI:  That was the only question I had.

15    Thank you.

16              THE COURT:  Mr. Stadnick?

17              MR. STADNICK:  No, your Honor.  No questions.

18              THE COURT:  All right.  Thank you, everyone.

19    Good-bye.

20              (Telephone conference ends at 3:10 p.m.)

21

22         I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.
23

24                            /s/ Brian P. Gaffigan
                              Official Court Reporter
25                              U.S. District Court
```