# EXHIBIT A

UNITED STATES PATENT AND TRADEMARK OFFICE

---

In the Ex Parte Reexamination of

U.S. Patent No. 7,324,469 B2

SATELLITE DISTRIBUTED HIGH SPEED INTERNET ACCESS

Filing Date: September 27, 2004

Issue Date: January 29, 2008

---

Reexamination Control Number: 90/015,619

---

**DECLARATION OF BRUCE R. ELBERT IN SUPPORT OF PATENT OWNER**

decisions it makes or enforces concerning network service. Equipment having those characteristics may be supplied as a dedicated appliance or integrated with equipment that performs additional functions. Variation in manufacturer, enclosure, circuit-board design, or physical packaging does not eliminate the identifiable network architecture and access-control role described in the patent.

[0050] Claim 1 identifies a satellite dish, a router, and a subscriber access unit operatively coupled between them. It separately identifies the user's web-ready device, a remote server on which the subscription account is created, and a subscriber access website used to verify the account. A skilled artisan would therefore understand the subscriber access unit as a component of the local hotspot equipment, distinct in its identified role from the user's device and the remote account service. Its relationship to the router and satellite path informs the kinds of network communications it must handle. '469 Patent, claim 1.

[0051] Claim 24 adds that the subscriber access unit is capable of authenticating a subscription account before allowing Internet access. Read with its location between the router and satellite dish, that capability identifies an active access-control component consistent with its intelligent role to provide subscriber access, rather than a passive cable or an unspecified connection. In the implementation described in the patent, the unit participates in a coordinated authentication process with a remote server. The fact that the remote server performs credential validation does not make the local unit passive; the local unit has its own configured role in directing and controlling the user's access. '469 Patent, claim 24; col. 4, ll. 1–16, 46–67.

[0052] Claim 15 provides additional technical detail. The router forwards the user's connection to the subscriber access unit, and the unit retrieves the static IP address of a remote server from memory. Those operations identify both an incoming network connection and stored configuration information that the unit

[0092] Mobility likewise does not, by itself, establish or rule out the recited transient traffic or either claimed location characteristic. Movement of equipment or a venue and the characteristics of the location at which the equipment operates are different matters.

[0093] Claim 1 places the identified hotspot equipment at a rural location experiencing the recited traffic, while claim 24 places the equipment at a remote location experiencing that traffic. These characteristics therefore must apply together to the same proposed installation. A disclosure concerning transient traffic at one venue and a separate disclosure concerning a rural or remote location do not, without further technical explanation, identify that combined operating environment. This observation does not require surveyed visitor counts or any particular measurement methodology.

### E. Authentication and Internet Access Through the Device to Router Connection in Claim 24

[0094] From a technical perspective, I understand claim 24 to describe an Internet hotspot with capabilities that become available to a user through a data connection between the web-ready device and the router. The statement that "the user may authenticate the subscription account and access the Internet at the remote location" describes what the hotspot permits the user to accomplish through that connection. An engineer can evaluate whether the described hardware, software, and network configuration provide those capabilities without requiring a user to be performing those operations at the moment of evaluation. '469 Patent, claim 24.

[0095] The word "may" is consistent with making a capability available for the user to invoke. It does not suggest that every connection attempt necessarily results in successful authentication or Internet access. A user might establish the device-to-router connection without completing authentication, or might submit information that does not authenticate the subscription account. The relevant technical inquiry is

whether the hotspot provides an operative arrangement through which the user can authenticate the account and obtain Internet access when authentication succeeds.

[0096] Establishing the data connection and authenticating the subscription account are distinct technical events. The connection provides a communication path through which the web-ready device can participate in the authentication interaction. Establishing that path does not necessarily authenticate the account automatically. For example, an implementation may call for the user to provide credentials or other authentication information after the connection has been established. I therefore understand the clause to associate the connection with the availability of the authentication and access functions, without treating connection establishment alone as sufficient authentication.

[0097] This understanding is reinforced by the preceding description of the subscriber access unit as "capable of authenticating a subscription account associated with a user prior to allowing the user access to the Internet." Read together, these portions of claim 24 describe a coordinated relationship: the user connects the web-ready device to the router, the hotspot permits authentication of the user-associated subscription account, and authentication precedes the Internet access authorized through that account. The subscription account involved in the user's authentication interaction is the account addressed by the subscriber access unit's recited authentication capability. '469 Patent, claim 24.

[0098] I would also distinguish authentication of the subscription account from other operations that may occur when establishing network connectivity. Association with a wireless access point, assignment of an IP address, or verification of a device identifier may support the overall interaction. Whether such an operation authenticates the user-associated subscription account depends on how the operation is linked to that account. Merely identifying a device or establishing a usable network link does not explain that account-authentication relationship.

[0099] The sequence also accommodates the restricted or service-specific communications needed to perform authentication before general Internet access is authorized. Those messages may traverse Internet infrastructure to reach an authentication component, but carrying those limited communications is technically different from enabling the user's subsequent general Internet access. The configuration should identify what communications are permitted before authentication and how the authentication result governs the access later made available to the user.

[0100] For a proposed hotspot arrangement, I would identify how the web-ready device's data connection to the router enables the user to participate in authentication of the subscription account, how the subscriber access unit supplies its recited authentication capability, and how successful authentication permits Internet access at the remote location through that device-to-router connection. Those relationships concern the coordinated operation of the apparatus. A general statement that a network supports authentication, without explaining its connection to the subscription account and the user's access through the identified router, does not provide the technical information needed to evaluate that arrangement.

### F. Rural Character and Remoteness Are Distinct Potentially Overlapping Attributes of a Hotspot Location

[0101] From a technical perspective, "rural location" and "remote location" identify different, although potentially overlapping, characteristics. The '469 Patent uses the two terms separately, and a disclosure concerning one does not automatically establish the other. I do not understand the patent to adopt a particular distance, accessibility, population, or infrastructure criterion as a definition of "remote location."

[0102] The '469 Patent uses these terms separately. Claim 1 describes installation of the identified equipment in a rural location, while claim 24 describes

[0117] Figure 15 is relevant to the physical and functional arrangement of Kalavade's hotspot. It identifies access points 101, BBSM 100, upstream router 102, and an authentication RADIUS server as distinct components. The access points provide local wireless access. BBSM 100 performs access-control functions and blocks access to router 102 until authentication has occurred. It presents a login request and passes the authentication request to a separate authentication server using a protocol such as RADIUS. When that server grants the request, BBSM 100 informs router 102 that the user's traffic may pass. Id. ¶ 258, Fig. 15.

[0118] Kalavade therefore does not treat an access point, BBSM, upstream router, and authentication server as interchangeable names for one network element. Access point 101 supplies the user-facing wireless connection. BBSM 100 controls admission and presents the login request. Router 102 supplies the upstream Internet connection. The separately identified authentication server evaluates the request. Kalavade itself does not identify access point 101 as router 102 or BBSM 100 as the component that necessarily compares the user's credentials with stored information.

[0119] Kalavade explains that a script may be added to BBSM 100 to ask the user to select a wide-area-network operator and forward the request to the corresponding CBG. Id. ¶ 259. BBSM 100 does not thereby become the CBG, the operator database, or the authentication server that performs the selected database comparison.

[0120] Kalavade separately describes service signup and subsequent service usage. In a BBSM-based signup scenario, BBSM 100 supplies a signup page and determines which CBG server to contact. The CBG service-provisioning module requests identifying information and validates the user against an HLR or another operator database. The user then creates a login and password, which are stored in a local database associated with the CBG server. Id. ¶¶ 284–293.

transceiver extender located on the upstream side between a router and subscriber-access or satellite equipment.

[0208] In summary, Wu does not describe the complete claim-15 relationship in which a subscriber access unit retrieves the static IP address of that arrangement, the user views the arrangement's interface through the resulting Internet connection, the account-creation prompt occurs under the recited conditions, and the arrangement updates the user's account to subtract the time used. Wu's separate teachings concerning possible satellite channels also do not themselves supply that connected sequence at the claimed installation.

## VIII. The Technical Rationales Stated in the Office Action Do Not Support the Particular Claimed Arrangements

[0209] I have considered whether the technical reasons identified in the Office Action would have led a person of ordinary skill in the art to make the particular combinations proposed. In my opinion, those reasons may support consideration of certain individual technologies, but they do not, without additional technical explanation, support all of the component relationships and operating sequences attributed to the resulting combinations in my claim-specific analysis. My opinion does not depend on physical incompatibility or an inability to construct a functioning network using teachings from the references.

[0210] The '469 Patent addresses a specific system-level technical problem: providing practical high-speed Internet access to transient users, particularly at rural or remote locations where conventional access may be unavailable or inconvenient. The patent explains that travelers often lacked Internet access unless they carried their own satellite equipment, were near a service provider, or located a hard-wired commercial access point. '469 Patent at 1:14–31. The disclosed solution coordinates satellite backhaul, local user access, subscriber-access equipment, and remote

subscription administration so that users can obtain Internet access through their own web-ready devices. *Id.* at 1:33–2:12, 3:35–4:55.

[0211] I consider that technical problem as context for understanding how the disclosed components and operations relate to one another. I do not assume that the references must identify the same problem or that an engineer could consider their teachings only for the purposes stated in the '469 Patent. From a technical perspective, however, a reason directed to one design choice does not necessarily support the other independent choices needed to produce the complete claimed arrangement. I therefore considered what modification each stated rationale would actually prompt and what technical relationships it would leave unestablished.

[0212] The Office relies on different satellite rationales in the asserted combinations. For the rural-location combinations, Bruner teaches communications for remote users, including rural users, and identifies satellite communications as one available transport. Bruner ¶¶ 6–8, 21. For the Hagen combination, the Office relies on Clark's description of high bandwidth and fast data rates as a reason to use Clark's satellite system for the last-mile connection. Office Action at 13, 26; Clark at 3:49–64. Those teachings provide technical reasons to consider satellite transport for a new or modified deployment. I do not assume that an existing terrestrial connection first must be shown to have failed or to be inadequate.

[0213] Those reasons concern selection of the network's backhaul medium. Bruner's rural-user teachings do not identify a rural location having the claimed transient-traffic characteristic. Kalavade's public-access venues may be relevant to transient traffic, but their venue categories do not themselves establish rural or remote character. Clark separately supplies a remote-site and satellite-connectivity teaching. Even accepting that teaching as establishing remoteness, Clark's bandwidth and data-rate rationale does not establish that the resulting site experiences the claimed relatively high volume of transient traffic. Thus, the satellite

rationales explain why an engineer might consider satellite transport, but they do not address the additional inference that the resulting selected installation possesses both location characteristics required by the applicable claim.

[0214] The satellite substitution also does not determine the authentication, database, or account-management operations performed over that link. Replacing a terrestrial connection with satellite transport ordinarily changes the communications path without, by that fact alone, reallocating application-layer functions among a local access device, a remote authentication service, and a billing database. Clark's bandwidth rationale therefore does not supply the remote-server and account-update relationships separately recited in claim 15.

[0215] The stated security rationale, however, is directed to the location and administration of authentication. It does not identify the complete resulting relationship among Hagen's NAS, Hagen's integration operator distributed services, Kalavade's remote webpage and database, and the account-management functions drawn from Wu. In particular, it does not establish that the static IP address retrieved by the subscriber access unit identifies the same remote-server arrangement whose interface is viewed by the user, that the conditional account-creation step occurs within the resulting interaction, or that the remote-server arrangement later updates the account in the same database used for credential verification by subtracting the time used during the completed session. Those relationships do not follow technically from the benefit of relieving the local NAS of authentication responsibility.

[0216] I have separately considered the Office's proposal to combine Hagen and Kalavade's time-based billing teachings with Wu's prepaid-balance update. Hagen and Kalavade provide teachings relevant to measuring or billing for minutes of use, while Wu provides teachings concerning prepaid access, monitoring usage

time, and updating a prepaid balance. Those teachings provide a technical basis for tracking session duration and administering prepaid access.

[0217] The particular account operation described by Wu calculates charges from usage time and an applicable charge rate and deducts the reported charges from the prepaid balance maintained in its PIN database. Wu ¶¶ 35, 65–67. Hagen paragraph 137 concerns a voice-billing table containing call-duration and cost-per-minute information. That table can support calculating a monetary charge for a voice call. These disclosures relate elapsed time to billing, but neither identifies an operation in which the duration of the completed Internet session is applied as the amount subtracted from the user's account in the database used for verification.

[0218] The Office states that combining minute-based billing with Wu's prepaid system would require deducting use from a balance. Office Action at 30. Wu uses its PIN database both to verify credentials and to update a monetary balance. The proposed adaptation therefore raises a more specific question: what account quantity is maintained and updated in the combined system? The cited disclosures describe measuring session duration, calculating a monetary charge from duration and an applicable rate, and debiting that charge from a monetary balance. They do not describe using the completed Internet-session duration itself as the quantity subtracted from the account. The stated rationale also does not explain how Hagen's addressed IODS, Kalavade's webpage and verification flow, and Wu's PIN database are associated so that the account verified through the addressed remote-server arrangement is the account receiving the proposed time-subtraction update. I do not contend that such an integration could not be engineered.

[0219] The Office also identifies a more specific reason for using Volpano's SMC wireless router. Volpano describes a commercially available device capable of supporting both wired and wireless subscriber connections, and Kalavade contemplates both forms of access. Office Action at 12–13, 39–40. Providing both

connection options is a recognizable technical benefit, and I do not dispute that this benefit could lead an engineer to consider a device of the type described by Volpano.

[0220] Volpano describes materially different operating configurations, including Layer-2 bridging, Layer-3 routing with network address translation, and Layer-3 routing without network address translation. Volpano ¶¶ 7, 13–16, 92. The Office's citation to Figure 2A points to the Layer-3/NAT configuration. If that configuration is intended, address translation occurs at the modified access point before traffic reaches BBSM 100; if another Volpano mode is intended, the component boundaries and addressing behavior differ. The dual-access rationale explains why an engineer might consider the Volpano device, but it does not by itself resolve how the selected configuration maps the claimed router, BBSM 100, Kalavade router 102, and the added satellite equipment. My point is a configuration-specific mapping issue, not technical inoperability.

[0221] Hagen's repeater presents a different configuration-specific issue. Hagen places repeater 2 on the user-facing radio link between mobile terminal 1 and WAP 3. Hagen ¶¶ 41, 44–45, 48. Hagen's stated technical reason for using the repeater is to increase terminal-to-WAP coverage. That reason leads to Hagen's disclosed ordering: mobile terminal, repeater, and WAP.

[0222] Claims 12 and 31 require the extender on a different network segment. Placing an extender on the network-facing side of the asserted router would connect different endpoints and perform an upstream infrastructure function. Such a link could be engineered, but Hagen's terminal-coverage objective does not provide a technical reason to relocate its repeater across the asserted router. A general desire to extend wireless range does not resolve this difference because the link being extended determines the repeater's endpoints, interfaces, and position in the network. Hagen supplies a reason for extending the user-facing link, not the network-side link required by the claims.

[0223] In summary, the stated rationales explain why an engineer might consider satellite transport, remote authentication, prepaid accounting, a dual-access router, or a terminal-side wireless repeater. They do not, by themselves, establish the technical relationships attributed to the resulting combinations in my claim-specific analysis. Specifically, they do not account for both location characteristics at one installation, establish the claimed continuity among the addressed remote-server arrangement and database operations, identify the claimed time-subtraction update, resolve the component mapping for the relied-upon router configuration, or support relocating Hagen's repeater to the required network-side segment. That opinion concerns the technical scope of the Office's stated rationales and does not depend on the references pursuing the same problem as the '469 Patent or on the claimed arrangement being the preferred implementation.

## IX. Analysis of Claims 1 and 2 and Claims 9 to 11 and 13 and 14

[0224] My technical assessment of the proposed combination addresses the installation and operation described in claim 1 as a connected arrangement. The claim places the satellite dish, router, and subscriber access unit at a rural location experiencing a relatively high volume of transient traffic, with the subscriber access unit operatively coupled between the dish and router. It also describes connecting a web-ready device to the router, creating a subscription account on a remote server, navigating a browser to a subscriber-access website, verifying the account through that website, and enabling Internet access. Evaluating those relationships involves examining the proposed equipment, its operating location, and the interaction available to users at that location. '469 Patent, claim 1.

[0225] I understand the Office Action to propose using a wireless router described by Volpano in place of Kalavade's access point, providing satellite connectivity using the teachings of Bruner and Clark, and deploying the resulting system in a rural location. The Office Action therefore identifies proposed

location opinion therefore does not depend on treating monetary and time-based accounting as technically incompatible.

## XIII. Claims 24 to 29 and 32: Kalavade, Volpano and Clark Do Not Identify the Claimed Remote High Transient Traffic Hotspot in a Defined Operating Configuration

[0296] I have reviewed claim 24 and the cited disclosures of Kalavade, Volpano, and Clark from a technical perspective. I understand claim 24 to describe one Internet-hotspot apparatus in which the satellite dish, router, and subscriber access unit are located at the same remote location experiencing a relatively high volume of transient traffic. I further understand the apparatus to permit the user to authenticate a subscription account and obtain Internet access through the data connection between the user's web-ready device and the router.

[0297] Claim 24 applies "remote location" and "a relatively high volume of transient traffic" to the same installation. Those are separate characteristics: a showing concerning one does not automatically establish the other. I do not apply a separate geographic-distance, accessibility, population-center, or infrastructure test to "remote location." My technical point is limited to whether the proposed combined apparatus is shown at one location possessing both characteristics recited by the claim.

[0298] Kalavade describes wireless hotspots at airports, convention centers, coffee shops, hotels, kiosks, and similar public-access venues. Even assuming that one or more of those venue types has the asserted transient-traffic characteristic, Kalavade does not characterize the relied-upon hotspot installation as remote. The venue category alone does not establish that separate claim characteristic. Kalavade ¶¶ 5, 237, 258, 261 and claim 66.

[0299] Kalavade paragraph 258 states that the authentication server may be located at the hotspot or elsewhere on the public Internet. That statement concerns

the network location of the authentication server, not whether the hotspot itself is at a remote location. Likewise, an 802.11 wireless connection is an access technology usable in many settings. Neither a server elsewhere on the Internet nor wireless client access, by itself, establishes that the hotspot installation is remote.

[0300] Kalavade's other references to "traffic" must be understood in their networking context. Paragraph 258 describes BBSM 100 informing router 102 that authenticated data traffic may pass, and other passages measure traffic as octet counts for accounting. Those statements concern digital communications. They do not, without more, address whether the same installation experiences the recited transient traffic. This distinction does not require a particular visitor count or measurement protocol.

[0301] Clark supplies a separate teaching directed to a wireless LAN linked through a mobile hub to a satellite communications system. Figure 1 labels LAN 104 as a remote wireless LAN, and Clark states that clients may access Internet services from remote location nodes. Clark also describes mobile unit 103, including server 103A, connecting the location LAN to the Internet backbone through the satellite system. I therefore do not exclude Clark as a teaching concerning remote-site connectivity, an on-site satellite terminal, or Internet access. Clark at 3:49–64, 4:1–45, 5:17–21 and Fig. 1.

[0302] Clark does not expressly characterize its remote installation as experiencing a relatively high volume of transient traffic. Its references to high bandwidth, fast data rates, broadband production communications, and large image, video, and graphics files concern the quantity and transmission rate of digital information. Data volume and the claimed transient-traffic characteristic are different technical matters. Even if persons at Clark's production or industrial locations may be present temporarily, increased bandwidth or satellite capacity does not itself establish the claimed traffic characteristic.

[0303] Clark's examples include a film or television production unit, a stage or studio lot, and oil-and-gas, construction, and other nomadic industrial applications. Personnel at those locations may be present temporarily. I do not rely on Clark's failure to provide visitor counts, measured turnover, or a comparison with another population. The narrower point is that Clark does not characterize those installations as experiencing the recited relatively high volume of transient traffic or otherwise connect the temporary presence of personnel to that claimed site characteristic.

[0304] Conversely, even if Kalavade's airport or convention-center examples are treated as having the claimed transient-traffic characteristic, adding Clark's satellite transport does not itself establish that the venue is remote. Satellite service can be installed at nonremote locations for mobility, redundancy, broadcast distribution, capacity, or rapid deployment. The selected communications medium does not determine the physical character of the site.

[0305] The cited references provide separate teachings concerning public-access venues, remote communications, and satellite backhaul. Even assuming that Kalavade's cited venues have the asserted transient-traffic characteristic, the cited technical mapping does not identify the resulting installation in which that venue is also remote and contains the proposed apparatus. I do not suggest that such a hotspot would be technically impossible to construct. My opinion concerns the particular combined installation under review.

[0306] Claim 24 also describes a connected authentication-and-access relationship. Establishing the data connection between the web-ready device and the router must place the device in an arrangement that permits the user to initiate or complete authentication of the associated subscription account and, following successful authentication, obtain Internet access. From an engineering perspective, this requires an access-control workflow in which the authentication result controls

admission to Internet service. The independent presence of authentication functionality somewhere in the network and an unrelated Internet connection would not establish that relationship.

[0307] The subscriber access unit need not itself contain the credential database or locally perform every authentication calculation. In the '469 Patent's exemplary implementation, subscriber access unit 16 employs a RADIUS client and directs the connection to remote RADIUS server 28, which validates the user's credentials and account. The subscriber access unit participates in the authentication arrangement even though the remote server performs the database comparison. '469 Patent at 4:20–28, 4:34–55 and claim 24.

[0308] Kalavade describes access-control flows in which BBSM 100 blocks upstream traffic, presents or participates in a login interaction, forwards authentication information, and permits traffic after receiving a successful result. For purposes of my analysis, I assume that the Volpano and Clark modifications preserve that authentication-and-access relationship. That assumption does not establish that the resulting apparatus is installed at one location having both location characteristics recited in claim 24. The choice among Volpano's operating modes affects the precise component mapping, as discussed below, but I do not treat that choice as establishing that authentication would fail.

[0309] The final component arrangement also matters to the technical comparison. Kalavade Figure 15 shows access points 101 on the user-facing side, BBSM 100 as access-control equipment, and router 102 on the network-facing side. Paragraph 258 expressly identifies element 102 as the upstream router that BBSM 100 instructs to permit traffic after authentication. Element 102 is not a user device.

[0310] As I understand the Office's apparent mapping, Kalavade access point 101 is modified using Volpano and treated as the claimed router, while BBSM 100

is treated as the subscriber access unit. Kalavade's existing router 102 remains a separate upstream component unless it is expressly removed or replaced.

[0311] Clark's Figure 1 presents a different architecture. Mobile unit 103, including server 103A, interfaces LAN 104 with Clark's satellite communications system. Server 103A coordinates communication with the satellite transmission-and-reception equipment, accesses a proxy server, synchronizes with the network operations center, and performs other gateway functions.

[0312] Volpano distinguishes a conventional 802.11 access point operating as a Layer-2 bridge from a wireless router forwarding Layer-3 datagrams. Its Figure 2A router employs network-address translation, while paragraphs 91–93 describe Layer-3 routing without NAT as another option. Those configurations establish different network boundaries and present different addressing information to upstream equipment. Volpano ¶¶ 7, 11, 13–16, 91–93. That distinction is relevant to identifying the operating configuration mapped to modified access point 101, but it does not itself demonstrate technical incompatibility with Kalavade.

[0313] The Office specifically cites Volpano's SMC wireless router and Figure 2A in proposing the substitution at access point 101. If Figure 2A's Layer-3/NAT configuration is used, address translation occurs at modified component 101 before packets reach BBSM 100. That changes the network boundary and the source-address information presented upstream. The cited record, however, does not establish that Kalavade's BBSM admission process necessarily depends on an untranslated client address. Kalavade describes BBSM 100 coordinating login and authentication and controlling access through upstream router 102. I therefore do not opine that NAT prevents or impairs those functions.

[0314] Volpano paragraph 92 also permits Layer-3 routing without NAT, and its discussion of conventional access points identifies a Layer-2 bridge configuration. If either configuration is intended instead, the precise interfaces and

address presentation would differ. If a configuration other than Figure 2A is intended, identifying that configuration would clarify the component and data-path mapping. Any uncertainty on that point is a mapping issue, not evidence that the combination is technically inoperable. For purposes of the remaining analysis, I assume that the selected mode preserves Kalavade's authentication-and-admission operation.

[0315] Accordingly, my opinion concerning claim 24 does not depend on an asserted technical incompatibility among Kalavade, Volpano, and Clark. I have assumed an inline Clark-satellite implementation, the claimed relative component ordering, and preservation of Kalavade's authentication-and-access relationship under an appropriate Volpano operating mode. Under those assumptions, selecting a wireless router and satellite backhaul does not itself establish that the resulting installation is at one remote location experiencing the recited relatively high volume of transient traffic.

## XIV. Claim 30: The Vivato Switch Does Not Establish Both Claimed Location Characteristics at the Same Installation

[0316] I have reviewed claim 30 and the cited Vivato 2.4 GHz Wi-Fi Switch User Guide from a technical perspective. Claim 30 depends from claim 29 and therefore retains the apparatus relationships of claims 24, 26, 28, and 29, including the satellite-supported hotspot, the subscriber access unit operatively positioned between the satellite dish and router, the authentication-and-access relationship, simultaneous user connections, and the amplifier and antenna operatively coupled to the router.

[0317] The Vivato User Guide describes a 2.4 GHz IEEE 802.11b switch available in indoor and outdoor versions. It states that the switch can operate on multiple simultaneous channels and uses an integrated high-gain, electronically steered transmit-and-receive antenna. It also describes infrastructure-BSS operation

## XVII. Declaration

[0347] I declare that all statements made in this declaration of my own knowledge are true and that all statements made on information and belief are believed to be true. I understand that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and may jeopardize the validity of the application or any patent issuing thereon.

Executed on: 10/2/2026

At: Georgetown, TX

Signature: DocuSigned by: Bruce R. Elbert 145509255DB4457...

Bruce R. Elbert